1
2
3
4
5
6
7
8
9
10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13   ROBERT BRADLEY NORRIS,                 Case No.15-cv-04962-JSC

                  Plaintiff,
14
                                            **ORDER RE: CROSS-MOTIONS FOR**
         v.                                 **SUMMARY JUDGMENT**
15
                                            Re: Dkt. Nos. 77 & 89
16   LAWRENCE J. MAZZOLA, et al.,

                  Defendants.
17

18

19          Plaintiff, a union plumber, participants in the Local 17 pension plan in Memphis,

20   Tennessee.  In 2012 and 2013, he worked in the Bay Area for an employer who was a signatory to

21   a collective bargaining agreement with Local 38.  Pursuant to that agreement, his employer made

22   pension plan contributions to the Local 38 pension plan.  Local 38 subsequently transferred to

23   Local 17 $4.45 of the more than $19 per hour of pension contributions made to the Local 38 plan

24   on Plaintiff's behalf.  Plaintiff claims that under ERISA, the Local 38 plan may not retain any

25   portion of pension contributions employers made to it on behalf of workers who have designated a

26   different plan as their "home fund," and instead, must transfer all of those contributions to the

27   respective worker's home fund.

28          The parties' cross-motions for summary judgment are now pending before the Court.

United States District Court
Northern District of California

1    (Dkt. Nos. 77 & 89.)  Having considered the parties' written submissions, and having had the

2    benefit of oral argument on December 8, 2016, the Court GRANTS in part and DENIES in part

3    Plaintiff's motion for summary judgment and GRANTS in part and DENIES in part Defendants'

4    motion for summary judgment.  Defendants improperly retained employer contributions made on

5    Plaintiff's behalf while he was working in Local 38's jurisdiction.

6                             **SUMMARY JUDGMENT EVIDENCE**

7         **A.  Factual Background**

8         Plaintiff Robert Bradley Norris is a plumber and member in good standing of United

9    Association Local 17 ("Local 17"), which is located in Memphis, Tennessee.  (Dkt. No. 80 at ¶ 2.)

10   He is also a participant in the Local 17 Defined Benefit Pension Plan ("the Local 17 Plan").  (*Id*. at

11   ¶ 3.)  In August 2011, he obtained a travel card from Local 17 and relocated to San Francisco,

12   California.  (Dkt. No. 90-2 at 10:3-13; 14:17-20.)  Plaintiff then sought work through United

13   Association Local 38 ("Local 38") as a journeyman plumber and designated the Local 17 Plan as

14   his "Home Fund."  (Dkt. No. 80 ¶ 3.)

15        Nearly a year later, he was hired by ACCO Engineering, a signatory to a collective

16   bargaining agreement with the Local 38 Union.   (*Id*.; Dkt. No. 90-2 at 23:12-24.)  From July 2,

17   2012 until July 1, 2013, Plaintiff worked 1738 hours under a collective bargaining agreement,

18   pursuant to which ACCO Engineering made contributions on his behalf to the Local 38 Plan (the

19   "Local 38 Plan").  (*Id*. at 24:11-13; Dkt. Nos. 54-8 at 41-46 & 54-9 at 2-6.[1])  ACCO Engineering

20   contributed to the Plan at the rate of $19.18 for hours worked in 2012 and $19.83 per hour for

21   hours worked in 2013.  (Dkt. No. 78-5.)  Of these contributions, the Plan transferred $4.45 per

22   hour Plaintiff worked to the Local 17 Plan and retained the remainder.  (Dkt. No. 54-8 at 5.)

23        **B.  The Reciprocal Agreement**

24        Both Local 17 and Local 38 are signatories to the United Association Pension Fund

25   Reciprocal Agreement ("Reciprocal Agreement").  (Dkt. No. 57-2; Dkt. No. 78-1; Dkt. No. 79 at ¶

26   3.)  The Reciprocal Agreement, Section 3, states in relevant part:

27

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7

Each Visited Fund shall make an accounting monthly of the Employer Contributions received by it during the month on behalf of Travelers and ***shall remit those Employer Contributions to the Home Fund upon receipt*** but no later than 45 calendar days after the end of the calendar month during which the Employer Contributions were paid to the Visited Fund, ***provided that the Home Fund certifies to the satisfaction of the Reciprocity Committee that the Traveler shall receive full credit for all Employer Contributions received by the Home Fund pursuant to this Agreement***. Where such certification is not provided to the Reciprocity Committee, the Visited Fund may forward contributions equal to the contributions required for pension benefits under the collective bargaining agreement of the Home Local.

8   (Dkt. No. 54-2 at 3 (emphasis added).)  As a signatory to the Reciprocal Agreement, the Local 38

9   Plan was required to transfer contributions made to the Plan on behalf of travelling employees

10  such as Plaintiff to the travelling employee's Home Fund if the Home Fund certifies to the

11  Reciprocity Committee that the travelling employee shall receive full credit for all employer

12  contributions the Home Fund receives on the employee's behalf.  (*Id.*; Dkt. No. 54-8 at 5; Dkt. No.

13  79 at ¶ 5.)  Since 2004, Local 17 (Plaintiff's "Home Fund") has had a "Full Credit Certification"

14  on file with the reciprocity office.  (Dkt. No. 79 ¶ 4.)

15      **C.  Plaintiff's Communications with the Plan Trustees**

16          On December 2, 2014, Plaintiff wrote the Local 38 Plan Trustees (the "Trustees")

17  requesting Plan documents and other information associated with the Plan operation.  (Dkt. No.

18  54-3 at 2.)  Plaintiff identified himself as "participant in the Local 38 Pension Plan."  (*Id.*)  Two

19  weeks later, on December 15, the Plan's legal counsel responded by refusing to provide any of the

20  requested documents because Plaintiff was not a Plan participant.  (Dkt. No. 54-4.)  Just over six

21  months later, on June 23, 2015, Plaintiff, through legal counsel, wrote again identifying himself as

22  a Local 38 plan participant and requesting Plan documents and other information.  (Dkt. No. 54-5

23  at 3.)  A month later, Peter Machi, the Plan Administrator, responded by reiterating that Plaintiff

24  was not a Plan participant and that he was not owed any additional employer pension

25  contributions.  (Dkt. No. 54-8.)  This time, however, Machi attached some Plan documents and

26  information sought and requested that Plaintiff exhaust his administrative remedies.  (*Id.*)  Two

27  more letters were exchanged prior to Plaintiff's September 15, 2015 submission of an appeal to

28  the Plan.  (Dkt. Nos. 54-13, 54-14, 54-15.)  In his appeal, Plaintiff contested the determination

1    that he was not a Plan participant and that he was not entitled to any additional contributions or

2    benefits under the Plan or ERISA.  (Dkt. No. 54-15.)  When he did not receive a response or

3    acknowledgment of his appeal after nearly a month, his counsel sent a letter following up

4    regarding the status. (Dkt. No. 54-16.)  Two days later, Machi responded that the appeal had not

5    been processed because Plaintiff failed to provide certain information.  (Dkt. No. 54-17.)

6                                 **PROCEDURAL BACKGROUND**

7            Plaintiff provided Machi with the additional information and immediately filed the

8    underlying complaint on behalf of himself and a putative class seeking to recover reciprocity

9    contributions and the earnings thereon which were improperly withheld by Defendants: the Plan,

10   the Plan Trustees, and Peter Machi, the Plan Administrator.  (Dkt. No. 1.)  Plaintiff pleads four

11   claims for relief under ERISA, Section 502, codified at 29 U.S.C. § 1132: (1) Section

12   502(a)(1)(B), (2) Section 502(a)(2), (3) Section 502(a)(3), and (4) ERISA Sections 502(c)(1),

13   502(a)(2) or 502(a)(3).  Plaintiff seeks an accrued benefit on contributions wrongfully withheld, to

14   recover all losses due to Defendants' breach of the Plan terms and breach of fiduciary duty, and

15   seeks to enjoin Defendants from taking action prohibited by the Plan, the Reciprocal Agreement,

16   and ERISA.

17           Defendants previously moved to dismiss on many of the same grounds at issue here.  (Dkt.

18   No. 54.)  The Court denied the motion. (Dkt. No. 64.)    Plaintiff then filed a motion for statutory

19   damages under Section 502(a)(1)(A) and Defendants filed a motion for judgment on the pleadings.

20   (Dkt. Nos. 66 & 73.)  The Court denied the motions without prejudice to renewal in the context of

21   summary judgment.  (Dkt. No. 74.)  The Court set a briefing schedule for summary judgment

22   noting that it would set a briefing schedule for class certification upon disposition of the motions

23   for summary judgment.  The now pending cross-motions for summary judgment followed.  (Dkt.

24   Nos. 77 & 89.)

25                                          **DISCUSSION**

26           Plaintiff's core contention is that Defendants were required to transfer all pension

27   contributions made on his behalf to his Home Fund, not just $4.45 of the more than $19.00 per

28   hour contributed.  The Court first addresses Defendants' motion for summary judgment on the

United States District Court
Northern District of California

4

threshold questions of: (1) whether Plaintiff exhausted his claim before filing suit, and (2) if so, whether he has Article III standing to bring his claims.  The Court then turns to whether Plaintiff qualifies as a Local 38 Plan participant.  Finally, the Court examines the merits of Plaintiff's ERISA claims.

## I.      Defendants' Threshold Arguments

### A.  Plaintiff Exhausted his Claims

"As a general rule, an ERISA claimant must exhaust available administrative remedies before bringing a claim in federal court."  *Barboza v. California Ass'n of Professional Firefighters*, 651 F.3d 1073, 1076 (9th Cir. 2011).

#### 1)  Plaintiff's Benefits Claim

Defendants first argue that Plaintiff never made a benefits claim and therefore did not exhaust his administrative remedies as a matter of law.  Plaintiff, for his part, insists that his first communication with the Local 38 Trustees on December 2, 2014 was a benefits claim because in his letter he claimed to be a Plan participant, claimed that contributions had been made on his behalf between July 2012 and September 2013, and claimed that as a Plan participant he was entitled to certain documents to check on the status of such contributions and benefits.  (Dkt. No. 54-3.)  Plaintiff argues that Defendants made an adverse benefits determination regarding his benefits claim when, two weeks later, a Plan Administrator attorney responded by declining to provide Plaintiff with documents because he was "not a 'participant' in the U.A. Local 38 Defined Benefit Pension Plan."  (Dkt. No. 54-4 at 2.)  The Court is not persuaded.

Plaintiff's December 2 letter did not request Plan benefits and did not suggest that Plaintiff had any issue regarding the contributions made on his behalf; instead, Plaintiff requested certain documents.  Neither this initial request nor the Plan's response triggered the claims requirements of 29 C.F.R. § 2560.503-1.  *See Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 364 (7th Cir. 2011) (holding that a letter seeking documents and stating that the plaintiff would decide whether to appeal after receiving the documents was not a request for review).  Plaintiff's reliance on *Bard v. Boston Shipping Ass'n*, 471 F.3d 229 (1st Cir. 2006), is misplaced as plaintiff's letter there stated he wanted to apply for benefits, which the board denied because it concluded that he

was ineligible for benefits.  *Id*. at 232.

For this same reason, Plaintiff's claim cannot be deemed exhausted based on the Plan's December 15 response.  Plaintiff insists that the Plan's failure to advise him of his appeal rights in its December 15 response renders his claim exhausted.  *See* 29 C.F.R. § 2560.503-1(g).  Not so. The rule that a claim will be deemed exhausted if an employee benefits plan does not establish and follow reasonable claims procedures arises *after* a request for benefits is made.  *See Barboza*, 651 F.3d at 1079-80 (concluding that the plan's failure to make a determination on plaintiff's *disability benefits claim* within 90 days meant that plaintiff's claim was deemed exhausted under section 29 C.F.R. § 2560.503-1(l)).  In *Chavis v. Life Ins. Co. of N. Am.*, No. 09-2185, 2009 WL 4730643 (D.S.C. Dec. 8, 2009), in response to the plaintiff's request for benefits the disability claim manager sent a letter stating that the plaintiff was not eligible for long term disability and her claim had been closed.  2009 WL 4730643, at *4.  The court concluded that the plaintiff's claim was deemed exhausted under the regulations because the letter "did not provide any policy provision references, what steps might be necessary for plaintiff to perfect her claim, a description of the plan's review procedures, or any guidelines or rules on which defendant's decision was based."  *Id*. at *5; *see also Bard*, 471 F.3d at 240 (concluding that the plan violated ERISA's procedural safeguards by failing to provide adequate notice under the governing regulations 29 C.F.R. § 2560.503-1(g)(1) after determining that the plaintiff was not eligible for benefits in response to an inquiry regarding applying for benefits).  Here, Plaintiff's initial letter did not make a benefits claim; thus, there was no claim to deem exhausted by virtue of the Plan's December 15 response.

In contrast to the December 2 letter, Plaintiff's June 23, 2015 letter made a benefits claim. "[A] claim for benefits is a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasonable procedure for filing benefit claims."  *See* 29 C.F.R. § 2560.503-1(e).  The letter reiterated Plaintiff's contention that he was a Plan participant, sought an accounting of contributions made on his behalf under the Plan, requested an immediate transfer of any funds not previously transferred from the Local 38 Plan to the Local 17 Plan, and sought the same Plan documents previously requested.   (Dkt. No. 54-5.)  The letter also disputed the prior

1    determination that Plaintiff was not a Plan participant and stated that "[b]ecause Mr. Norris is a

2    Plan Participant under the terms of the U.A. Local 38 Defined Benefit Pension Plan, this denial

3    violated ERISA Section 104 and carries a continuing daily monetary penalty."  (*Id*. at 3.)

4        In response, Plan Administrator Machi elaborated on the Plan's insistence that Plaintiff

5    was not a participant entitled to benefits under the Local 38 Plan and advised Plaintiff of his right

6    to challenge the decision through an appeal to the Board of Trustees.  (Dkt. No. 54-8 at 7-8.)  This

7    response was an adverse benefit determination.  *See* 29 C.F.R. § 2560.503-1(m)(4) ("'adverse

8    benefit determination' means any of the following: a denial, reduction, or termination of, or a

9    failure to provide or make payment (in whole or in part) for, a benefit, including any such denial,

10   reduction, termination, or failure to provide or make payment that is based on a determination of a

11   participant's or beneficiary's eligibility to participate in a plan..."); *see also Bard*, 471 F.3d 229 at

12   240 n.12  ("For purposes of the ERISA regulations, the Board's initial determination that

13   [plaintiff] was ineligible to apply for benefits is an 'adverse benefit determination,'

14   notwithstanding the Plan's argument that the Board did not initially reject [plaintiff's] claim on its

15   merits"); *Chavis*, 2009 WL 4730643, at *4 (concluding that the regulations regarding "adverse

16   benefit determinations" do not make a "distinction between notifications relating to eligibility and

17   notifications of benefit determinations").

18               **2) Plaintiff's Appeal**

19       On September 15, 2015, Plaintiff filed an appeal without waiving his argument that no

20   further exhaustion was required due to the Plan's failure to follow the claims procedures.  (Dkt.

21   No. 54-15.)  Having received no response, Plaintiff sent a follow up letter a month later. (Dkt. No.

22   54-16.)  In response, Machi sent a letter stating that "the purported appeal for the denial of a claim

23   on behalf of Mr. Brad Norris cannot be processed because necessary information has not yet been

24   provided." (Dkt. No. 54-17 at 2.)  The letter delineated the information required before the appeal

25   could be processed under Article XX, Section 3 of the Plan.  A few weeks later, Plaintiff

26   submitted another letter specifically addressing this information.  (Dkt. No. 54-20.)  The next day,

27   Plaintiff filed this lawsuit. Defendants have not considered Plaintiff's appeal.

28       Defendants contend that Plaintiff's failure to follow the Plan's appeal procedures by filing

United States District Court
Northern District of California

7

this action without waiting for the appeals process to complete constitutes abandonment of Plaintiff's claim.  Plaintiff counters that given Defendants' failure to timely consider his appeal he adequately exhausted his claims.  Alternatively, Plaintiff contends that any further exhaustion of administrative remedies would be futile.

While Plaintiff's September 15 letter to Machi did not follow the precise format set forth in the Plan, much of the required information was in his letter. (Dkt. No. 54-15.)  Critically, the substance of Plaintiff's appeal was apparent from the letter—he challenged the determination that he was not a Local 38 Plan participant, and the finding that he was not entitled to any additional contributions made on his behalf.  Defendants nonetheless insist that the appeal omitted information necessary to process Plaintiffs' claim.  The Plan requires that an appeal include:

> 1. A statement as to each ground on which claimant believes the decision or other action appealed from to have been in error;
>
> 2. A list of the names and addresses of each person on whose testimony claimant will rely, in whole or in part, in support of the appeal, together with a short statement of the facts to which each such person is expected to testify; and
>
> 3. A list of each document upon which claimant will rely in support of the appeal.

(Dkt. No. 54-10 at 17.)  Plaintiff's September 15 appeal set forth the Plan's two adverse determinations and Plaintiff's arguments as to the errors in those determinations. (Dkt. No. 54-15.) It did not identify any witnesses on whose testimony Plaintiff intended to rely because—as Plaintiff subsequently confirmed—there were none. *Compare* Dkt. No. 54-17 *with* 54-20.  With respect to documents, in the body of his appeal letter Plaintiff identified the Plan, the Local 38 Collective Bargaining Agreement, "reciprocity agreements," and the arbitrator's decision in *Lehman v. Nelson* which "involve[d] similar issues".  (Dkt. No. 54-15.)  Further, Plaintiff's October 27 letter to Machi explicitly reiterated all of this information.  (Dkt. No. 54-20.) Although Plaintiff filed this action the day after he sent this letter to Machi, he stated that he would dismiss the action if the Plan heard the appeal and found in his favor.  (*Id*.)

### 3) Plaintiff's Claims are Exhausted

"The claims procedures for a plan will be deemed to be reasonable only if...[they] are not administered in a way, that unduly inhibits or hampers the initiation or processing of claims for

United States District Court
Northern District of California

benefits." 29 C.F.R. § 2560.503-1(b)(3).  These regulations require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."  *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  The Plan's contention that Plaintiff did not provide information necessary to support his appeal places form over substance.  Defendants had all the information necessary to hear Plaintiff's appeal.  *See Eppler v. Hartford Life & Acc. Ins. Co.*, No. C07-04696 WHA, 2008 WL 361137, at *11 (N.D. Cal. Feb. 11, 2008) ("In light of the solicitude under ERISA for claimants, Hartford should have gone ahead and given a second, independent look into the matter, treating it as an appeal without further submission").  That they chose not to do so is exactly that—a choice.  Plaintiff asserts that this choice resulted in his appeal not being heard within the requisite period such that his appeal must be deemed exhausted.  *See Barboza*, 651 F.3d at 1080 (concluding that the plan's failure "to render a decision within ninety days of Barboza's administrative appeal" meant that "Barboza's claims must be deemed exhausted").  As relevant here, the regulations provide that "the appropriate named fiduciary shall [] make a benefit determination no later than the date of the meeting of the committee or board that immediately follows the plan's receipt of a request for review." *See* 29 C.F.R. § 2560.503-1(i)(1)(ii).  Plaintiff's opposition states that the next regularly scheduled meeting was October 30, 2015.  It is undisputed that a determination was not made at this meeting or any subsequent meeting.  However, it is also undisputed that Plaintiff filed this action prior to that meeting.   Given that Plaintiff filed this action before the timeframe within which an appeal had to be decided, the Court cannot deem his claim exhausted as of the time he filed this action.

Nevertheless, Plaintiff has adequately demonstrated that any further exhaustion would be futile.  "[T]he futility exception [] is designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail."  *Diaz v. United Agr. Employee Welfare Ben. Plan & Trust*, 50 F.3d 1478, 1485 (9th Cir. 1995).  Defendants' conduct shows that Plaintiff's efforts to pursue an administrative review process were doomed to fail.  *See Foster v. Blue Shield of California*, No. CV 05-03324, 2009 WL 1586039, at *5 (C.D. Cal. June 3, 2009) (collecting cases finding that exhaustion was futile).  Moreover, Defendants' position in this litigation—seeking a declaration that Plaintiff is not a Plan participant, i.e., the same eligibility argument made during the claims

9

process—establishes the futility of any further administrative review.  *See Horan v. Kaiser Steel Ret. Plan*, 947 F.2d 1412, 1416 (9th Cir. 1991) *overruled on other grounds by Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) (concluding that exhaustion was unnecessary because the plan administrators "unequivocally state[d]… that the plaintiffs are not entitled to an annuity under the terms of the Plan."); *Foster*, 2009 WL 1586039, at *5 ("a clear position taken in litigation can provide grounds for excuse from exhaustion").

Thus, the record evidence persuades the Court as a matter of law that any failure to exhaust is excused based on Defendants' subsequent refusal to consider his appeal and because pursuing internal plan remedies would be futile.  *See Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626–27 (9th Cir. 2008) (stating that the failure to exhaust may be excused when the pursuit of such remedies would be futile or a plan does not establish or follow claims procedures as required by ERISA).  Defendants' motion for summary judgment on exhaustion is therefore denied.

As this Court previously noted, ERISA exhaustion is an affirmative defense.  *Norris v. Mazzola*, No. 15-CV-04962-JSC, 2016 WL 1588345, at *6 (N.D. Cal. Apr. 20, 2016) (collecting cases).  Although Defendants pled it as an affirmative defense, Plaintiff did not move for summary judgment.  The Court, however, may grant summary judgment sua sponte.  *See*  Fed. R. Civ. P. 56(f)(2) (providing that a district court may grant summary judgment sua sponte after giving the losing party "notice and a reasonable time to respond").  Defendants fully briefed their exhaustion argument in moving for summary judgment and the Court heard from the parties at length on this issue at oral argument.  Having considered all the parties' arguments, the Court sua sponte grants summary judgment for Plaintiff on Defendants' exhaustion affirmative defense.

### B.  Plaintiff has Article III Standing

Next, Defendants renew their argument that Plaintiff lacks Article III standing, although they take a different tack this time—arguing that Plaintiff has no standing because the harms he complains of relate to the independent decisions of third-parties.  The Court again disagrees.

"To satisfy Article III's case or controversy requirement, [a plaintiff] needs to show that he has suffered an injury in fact, that the injury is traceable to the challenged action of [the

United States District Court
Northern District of California

10

1  defendant], and that the injury can be redressed by a favorable decision." *Fortyune v. Am. Multi–*

2  *Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004).  Plaintiff has made the required showing.

3  Plaintiff's employer made pension contributions to Local 38 on his behalf and Defendants only

4  transferred a portion of these contributions to Plaintiff's Home Fund.  Defendants argue that

5  Plaintiff cannot establish standing because the Home Fund may make up the difference between

6  what his employer contributed and what Defendants paid to the Home Fund because the Home

7  Fund may "true him up."  There is no evidence in the record, however, that even remotely

8  suggests such a scenario is likely.  Plaintiff has adequately alleged an injury (that his employer

9  made contributions on his behalf which were not transferred to his Home Fund) that is traceable to

10  the challenged action of the defendants (Defendants retained the funds which Plaintiff contends

11  should have been transferred to his Home Fund on his behalf) and this injury can be redressed by a

12  favorable decision (if Plaintiff prevails, the full amount his employer contributed will be

13  transferred to his Home Fund).  Plaintiff has Article III standing; whether he prevails on his claims

14  is another matter as discussed below.

15  **II.     Plaintiff is a Plan Participant**

16          To establish ERISA standing, that is, statutory standing, a former employee such as

17  Plaintiff must make a "colorable claim" that he is a plan participant.  *Leeson v. Transamerica*

18  *Disability Income Plan*, 671 F.3d 969, 977 (9th Cir. 2012) (citing 29 U.S.C. § 1132(a)(1)(B)).  An

19  ERISA plan participant is "any employee or former employee of an employer . . . who is or may

20  become eligible to receive a benefit of any type from an employee benefit plan which covers

21  employees of such employer."  29 U.S.C. § 1002(7).  A claimant is a participant under ERISA if

22  the claimant has (1) "a reasonable expectation of returning to covered employment" or (2) "a

23  colorable claim to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117

24  (1989) (internal citation and quotation marks omitted).  Plaintiff bears the burden of proving his

25  participant status and thus his ERISA statutory standing.  *See Horton v. Reliance Standard Life*

26  *Ins. Co*., 141 F.3d 1038, 1040 (11th Cir. 1998) ("A plaintiff suing under [29 U.S.C.A. §

27  1132(a)(1)(B) ] bears the burden of proving his entitlement to contractual benefits."); *see also*

28  *Leeson*, 671 F.3d at 971 (holding that whether an individual is a "participant" is a substantive

element of an ERISA claim).

Plaintiff contends that he is a Local 38 Plan Participant for three independent reasons: (1) his right to Local 38 benefits has not yet been forfeited in light of the Rule of Parity; (2) he has a right to benefits under the Local 38 Plan's pro rata/partial pension addendum; and (3) he can enforce any Plan instrument, including the Reciprocal Agreement which gives him rights to the funds contributed on his behalf.

**A. The Rule of Parity**

The Local 38 Plan defines a Plan participant as an "employee who has fulfilled the eligibility qualifications set forth in Article II." (Dkt. No. 54-9 at 12.) Article II provides that "any Employee who works for one or more Employers and is credited with at least 287.5 hours of Contributory Service during a Plan Year shall be credited with such hours and shall thereupon be deemed a Participant until incurring a break in service." (*Id.* at 13.) Plaintiff indisputably meets these initial requirements as he worked 1738 hours between July 2, 2012 and July 1, 2013 for a covered employer. Further, under ERISA's "rule of parity," break-in-service rules must allow employees leave up to five years without losing credit for pre-break service, even if the service was less than the period of the break. In particular, the rule of parity prohibits loss of credits unless the break either equals or exceeds the greater of five years or the total number of years of service accumulated. *Flanagan v. Inland Empire Elec. Workers Pension Plan & Trust*, 3 F.3d 1246, 1247 (9th Cir. 1993); *Schendel v. Pipe Trades Dist. Council No. 36 Pension Plan*, 880 F. Supp. 710, 715 (N.D. Cal. 1995); *see also* 29 U.S.C. § 1053(b)(3)(D).[2] Thus, even if Plaintiff is credited with less than two years of service prior to his break commencing in July 2013, under ERISA's rule of parity, he would not forfeit his pension credits until his break exceeds five years, that is, not until 2018.

Defendants nonetheless insist that Plaintiff's break in service means he has forfeited his

---

[2] 29 U.S.C. § 1053(b)(3)(D) states: "[I]n the case of nonvested participants, years of service with the employer or employers maintaining the plan before any period of consecutive 1–year breaks in service shall not be required to be taken into account if the number of consecutive 1–year breaks in service within such period equals or exceeds the greater of—(I) 5, or; (II) the aggregate number of years of service before such period."

United States District Court
Northern District of California

pension credits (and thus is not a plan participant) because the rule of parity does not apply unless an employer prevents the employee from returning to covered employment. In other words, they contend the rule does not apply where, as here, an employee could return to covered employment but has not done so. As support they rely again, as they did in their unsuccessful motion to dismiss, on *Flanaghan*.

In *Flanaghan*, the plaintiffs ceased work short of the five-year service term required for accrued benefits to become nonforfeitable, that is, to vest. *Flanaghan,* 3 F.3d at 1247. By the time the plan terminated two years later, neither plaintiff had returned to covered employment. Upon the plan's termination, it distributed its assets to plan participants. Since the plaintiffs' benefits had not vested, they were denied benefits. The plan included a provision that in the event of a plan termination, the rights of each "affected participant" shall be nonforfeitable. *Id.* The Ninth Circuit first considered whether the plaintiffs were plan participants. The court concluded that plaintiffs became participants when their employer began making contributions on their behalf, and that they qualified as "terminated non-vested participants" under the plan. *Id*. at 1248. However, plaintiffs were only eligible for plan benefits if they qualified as "affected participants." *Id*. at 1249. The Ninth Circuit held that that the plaintiffs were affected by the plan's termination even though their benefits had not yet vested because they were within the rule of parity period and the plan's termination extinguished their opportunity to return to covered employment and vested benefits. *Id*. at 1250. An "affected participant" had the same meaning as an ERISA plan participant and the plaintiffs—terminated non-vested employees—were thus plan participants within the meaning of ERISA. *Id.* at 1249.

*Flanaghan* does not suggest that the rule of parity only applies to prevent forfeiture of credits if the employer takes action that prevents the employee from returning to covered work during the rule of parity period. *Id*. at 1251 ("the rule does guarantee a laid-off worker a specified period during which, if he or she resumes covered employment, and meets any break-in-service requirement, those credits can be reclaimed."). Rather, "[i]f the plaintiffs had been rehired prior to the expiration of their individual parity periods, and then had satisfied the additional service requirement, ERISA would have mandated that their prior service credits be counted." *Id*. at 1250

1  (quoting 29 U.S.C. § 1052(b)(3) ("service before such break shall not be required to be taken into

2  account ... until he has completed a year of service after his return")).  Thus, "[t]he break-in-

3  service rule merely delays the recording of prior service credits; it does not extinguish those

4  credits." *Id.*

5      So too here.  Under the rule of parity Plaintiff's accumulated benefits and credits cannot be

6  forfeited—and thus must count towards his vested credited service—until his break in service

7  exceeds five years.  Indeed, the Local 38 Plan Summary Plan Description expressly states as

8  much. [3]  (Dkt. No. 54-12 at 121.)  As Plaintiff's break in service has not exceeded five years, he

9  has non-forfeited credits in the Local 38 Plan and thus is a Local 38 Plan participant. *See* 29

10  U.S.C. § 1002(7).  As a participant he has a colorable claim to benefits due to Defendants' refusal

11  to transfer to Plaintiff's Home Fund all of the contributions made to the Local 38 Plan on

12  Plaintiff's behalf.  Plaintiff thus has statutory standing to sue.

13  **B.  The Pro Rata/ Partial Pension Addendum and Vested Years of Service**

14      Plaintiff maintains in the alternative that even if the Rule of Parity did not operate to

15  preserve his benefits when he stopped working in Local 38's jurisdiction on July 1, 2013, his

16  benefits are nonetheless vested pursuant to the Plan's pro rata provision and therefore he is a Local

17  38 Plan participant. This provision at Article XI of the Plan provides that:

18      Pro Rata Pensions are provided under this Plan for Employees who

19      would otherwise be ineligible for a pension because their years of
      employment have been divided between employment creditable

20      under this Plan and employment creditable under a Related Plan or
      whose pensions would otherwise be less than the full amount

21      because of such division of employment.
      . . .

22      The total of an Employee's Related Vesting Credited Service and

23      Vesting Credited Service he has accumulated and maintained
      directly under this Plan (referred to in this Article as U.A. Local

24      Union 38 Vesting Credited Service) shall be known as his
      Combined Vesting Credited Service.

25

26  [3]  The declaration of the Local 38 Plan actuary (Dkt. No. 91) does not create a genuine dispute.
    She does not address the Rule of Parity or the Summary Plan Description and ignores the Local 38

27  Plan's obligations under the Reciprocal Agreement.  Further, it is merely evidence that the Local
    38 Plan believes travelers such as Plaintiff are not plan participants, a fact that is undisputed.

28

United States District Court
Northern District of California

1

. . .

2

> Related Vesting Credited Service shall be counted in determining
> whether a break in service has occurred as set forth in Article V, to
> determine whether prior Combined Vesting Credited Service shall
> be cancelled.

3

4

(Dkt. No. 54-9 at 24.)   An employee is eligible for a pro rata pension if (1) "He would be eligible

5

for a Normal or Early Retirement, or Disability Pension under this Plan were his combined Benefit

6

Credited Service treated as U.A. Local Union 38 Credited Service; and (2) He has received at least

7

one year of U.A. Local Union 38 Benefit Credited Service." (*Id.* at 25.)

8

Plaintiff contends that he has five years of Vested Credited Service because the Plan

9

recognizes Plaintiff's years of service in connection with his Home Fund and it is undisputed that

10

he has more than five years vesting service when his service with the Home and Visited Funds are

11

combined.  Plaintiff relies on the Pro Rata/Partial Pension Addendum contained in the Plumbers

12

and Pipefitters National Pension Fund Reciprocity Agreement to establish his combined years of

13

vesting service.  (Dkt. No. 57-2.)  The Pro Rata/Partial Pension Addendum provides in relevant

14

part that:

15

> In general, the pro rata/partial pension addendum is used to cure
> breaks-in-service and/or make an individual, who has pension credit
> in two or more funds, vested and/or eligible in the pension fund(s)
> when he would not otherwise be vested/eligible for a pension benefit
> without use of this addendum.

16

17

18

. . .

19

> The first lists all of the defined benefit pension funds, besides the
> PPNPF, that are currently signatory to the multi-party UA optional
> pro rata/partial pension addendum to the United Association Pension
> Fund Reciprocal Agreement. As indicated, all funds signed to this
> addendum have to recognize any hours an individual may have in
> any of the signatory funds.

20

21

22

23

(Dkt. No. 57-2 at 15.)  Both Local 17 and Local 38 are listed as signatories to the Pro Rata/Partial

24

Pension Addendum. (*Id.* at 16.)   Plaintiff thus reasons he is eligible for a pro-rata pension under

the Local 38 Plan and is thus a Local 38 Plan participant.

25

Defendants respond that the Local 38 Plan's pro-rata provision only recognizes service in a

26

"Related Plan" for determining Vesting Credited Service—which Local 17 is not.  According to

27

Peter Machi, the current Plan Administrator for the Local 38 Trust Fund, "[t]he Local 38 Pension

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plan has not paid any Pro-Rata Pension nor has it had any Related Plans in over 50 years.  No

2    U.A. Local 17 ERISA-regulated plan is, or ever has been a Related Plan with respect to any U.A.

3    Local 38 ERISA-regulated Plan." (Dkt. No. 60-1 at ¶ 2.)

4           At oral argument, Plaintiff insisted that the Pro Rata/Partial Pension Addendum post-dates

5    and supersedes the Plan language regarding a "Related Plan."  Defendants responded that even if

6    so, the Pro Rata/Partial Pension Addendum only covers situations not covered by money-follows-

7    the-man reciprocity and Local 38 is a money-follows-the-man reciprocity local.  Indeed, Local 38

8    is listed as a defined benefit money-follows-the-man plan in the Reciprocity Agreement.  (Dkt.

9    No. 57-2 at 5.)   Plaintiff nonetheless maintains that regardless of how it is characterized—because

10   the money did not follow the man here—Local 38 cannot hide behind its money-follows-the-man

11   status and fail to comply with the Pro Rata/Partial Pension Addendum.

12          Plaintiff has not established that he is a Local 38 Plan participant due to the Pro

13   Rata/Partial Pension Addendum.  The gravamen of Plaintiff's complaint is that Defendants should

14   have, but did not, comply with their money-follows-the-man reciprocity agreement; in other

15   words, that under the circumstances here the money-follows-the-man rather than the Pro

16   Rata/Partial Pension Addendum applies.  By so arguing he concedes that the Pro Rata/Partial

17   Pension Addendum pro rata pension is not in play.  Moreover, the Addendum, by its terms,

18   applies when a participant has pension benefit credits in two or more funds and would not

19   otherwise be eligible without use of the Addendum.  (Dkt. No. 57-2 at 15.) Plaintiff has not

20   offered any evidence that he is not eligible for a Local 17 Plan pension and thus that he is eligible

21   to take advantage of the Addendum.  The Court therefore declines to find that the Addendum

22   provides an additional ground for concluding that Plaintiff has ERISA statutory standing.[4]

23   **III.    The Merits of Plaintiff's ERISA claims**

24          Having decided that Plaintiff has constitutional and statutory standing to bring ERISA

25   claims, the Court turns to their merits.

26

27   _____

28   [4] The Court also declines to reach Plaintiff's additional argument that he is a Local 38 Plan
     participant by virtue of the Reciprocal Agreement.

United States District Court
Northern District of California

### A.  Standard of Review

Generally, "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Here, the Plan provides that the "Trustees have the sole and absolute discretion to construe and to interpret the provisions of the Plan."  (Dkt. No. 54-10 at 20.)  Plaintiff nonetheless argues that the standard of review should be de novo because Defendants failed to follow the proper claims procedure.  Ninth Circuit law is to the contrary. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006) ("an administrator's failure to comply with . . . procedural requirements ordinarily does not alter the standard of review.").  Only "[w]hen an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, [will] we review de novo the administrator's decision to deny benefits."  *Id.* The Plan Administrator's conduct here was not so flagrant as to amount to an "utter disregard of the underlying purpose of the Plan."  Thus, abuse of discretion review applies.  Plaintiff's reliance on *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 47 (2d Cir. 2016) does not persuade the Court otherwise.  This Court is required to follow Ninth Circuit law and will apply the abuse of discretion standard.

### B.  Plaintiff's ERISA 502(a)(1)(B) Claim

Under ERISA Section 502(a)(1)(B), plan participants can bring suit to enforce plan terms. 29 U.S.C. § 1132(a)(1)(B).  Here, Plaintiff sues not to enforce the Local 38 Plan per se, but rather the Reciprocal Agreement to which Local 38 is a signatory.

#### 1) The Reciprocal Agreement is Part of the Local 38 Plan

Defendants contend that since the Reciprocal Agreement is not part of the Local 38 Plan, Plaintiff's ERISA claim must fail.  Based on the undisputed facts, Plaintiff may sue to enforce the Reciprocal Agreement as part of the Local 38 Plan.

First, Article XI of the 2015 version of the Plan and Section 5.2(r) of the Trust Agreement authorize the Trustees to enter into reciprocity agreements.  Article XI of the Plan provides that "[t]he Trustees are authorized to enter into reciprocity agreements with the Trustees of other

17

qualified plans under terms mutually agreeable and lawful." (Dkt. No. 54-18 at 3.) While this provision was not in the Local 38 Plan at the time Plaintiff worked in Local 38's jurisdiction, Defendants have not suggested that its absence somehow means that they were not authorized to enter into the Reciprocal Agreement. Indeed, the Trust Agreement, which was signed in 2009, explicitly states that the Trustees may "enter into agreements with other benefit plans and trusts providing for the reciprocity of contributions and/or eligibility credit as between a Plan and such other plans and trusts, or to merge a Trust Fund and Plans with other employee benefit funds and plans." (Dkt. No. 78-8 at 13.) That the 2015 Plan includes language regarding reciprocity agreements merely reinforces what was already the case; namely, that reciprocal agreements, which dictate how benefits earned pursuant to the Plan are treated, are intertwined with the Plan.

Second, the IRS Manual defines reciprocal agreements, such as the one at issue here, as auxiliary agreements and anticipates that such agreements may be incorporated into multiemployer pension plans. *See* IRS Manual, 4.72.14.1.1(2) ("For this IRM, Collective Bargaining Agreements (CBAs), Participation (Side) Agreements and Reciprocity Agreements are referred to as Auxiliary Agreements"); 4.72.14.1.1(17) ("Reciprocity Agreement is an agreement between two funds or plans to allow an employee's covered employment in another plan's jurisdiction to be credited towards a benefit in the employee's Home Plan."); 4.72.14.4.2(1) ("Multiemployer plans often incorporate references to these Auxiliary Agreements. Types of documents incorporated into these plans include: CBAs, Participation Agreements, Reciprocity Agreements). While the IRS Manual "does not have the force of law," *Anderson v. United States*, 44 F.3d 795, 799 (9th Cir. 1995), the IRS's treatment of reciprocity agreements suggests that it is not unusual for them to be considered part of a multi-employer pension plan.

Third, the ERISA caselaw, while not precisely on point, uniformly suggests that the Reciprocity Agreement is enforceable as part of the Local 38 Plan. In *Smith v. Contini*, 205 F.3d 597, 603–04 (3d Cir. 2000), for example, the Third Circuit discussed an earlier decision, *Hoover v. Cumberland Maryland Area Teamsters Pension Fund*, 756 F.2d 977 (3d Cir. 1985), and held that it was implicit in *Hoover's* holding that benefits provided pursuant to a reciprocity agreement "were provided under a covered plan for purposes of ERISA." *Contini*, 205 F.3d at 603-04. In so

United States District Court
Northern District of California

concluding, *Contini* noted that "[t]he establishment of reciprocal pension agreements promotes transfers of employees between employers within funds that are parties to reciprocity agreements and provides the employees with the apparent security that they will receive a pension based upon their combined years of service[; thus,] it would be inconsistent with the purpose of ERISA to allow funds to promote movement by employees in these circumstances while at the same time subjecting such employees to 'penalties' for having so moved."  *Id.*; *see also Keegan v. Steamfitters Local Union No. 420 Pension Fund*, 211 F. Supp. 2d 632, 642 (E.D. Pa. 2002) (concluding that "[t]he reciprocal agreements, as plan documents, are similarly governed by that statute.").[5]   Neither party cited authority—and the Court is unaware of any—which holds to the contrary; that is, that reciprocal agreements are not part of the plan.

While none of the above factors considered in isolation might be enough to conclude that the Reciprocity Agreement is enforceable under ERISA section 502(a)(1)(B) as a part of the Local 38 Plan, considered together they mandate that it be so considered. As the *Contini* court noted, the defendants "were under no obligation under ERISA to provide for reciprocal agreements and Pro-rata Pensions. Nevertheless, once having made the determination to provide for such pensions," they had a responsibility to administer their duties in accordance with ERISA. *Contini*, 205 F.3d at 605.

Defendants' lament that the Reciprocity Agreement prohibits enforcement by Plaintiff is unavailing. The Reciprocal Agreement states at Section 9:

> No person or entity, other than the signatory pension funds and their trustees, shall have any rights under this Agreement.  No person or entity that is not signatory to this Agreement shall be entitled to bring any action or proceeding against any party hereto on account of this Agreement, or shall be deemed to be a third-party beneficiary or real party in interest.

(Dkt. No. 54-2 at 5 § 9.)  The very next section, however, states that the trustees are not

---

[5]*Lehman*, while a factually similar case, is less helpful here as the provisions incorporating the reciprocal agreement in that plan were explicit.  *See Lehman v. Nelson*, No. C13-1835, 2014 WL 4540160, at *5 (W.D. Wash. Sept. 11, 2014) (rejecting defendants' argument that plaintiff lacked standing to enforce the reciprocal agreement noting that "Plaintiff is not suing to enforce the terms of the Reciprocity Agreements as a standalone contract but rather to enforce the terms of the Pension Plan, which in turn incorporates aspects of the Reciprocity Agreement.").

"personally liable for any action taken pursuant to the Agreement *except to the extent liability is imposed by operation of the Employee Retirement Income Security Act of 1974*."  (Dkt. No. 54-2 at 5, § 10 (emphasis added).)  And the next section provides that a traveler waives all claims against a Visited Fund upon the Visited Fund's transfer to the traveler's Home Fund of all employer contributions made to it on behalf of the traveler.  (*Id.* § 11.)  Read together, these provisions mean that while a traveler cannot bring a breach of contract claim arising out of a breach of the Reciprocity Agreement, a traveler could bring an ERISA claim arising from the Reciprocal Agreement provided the defendants, that is, the Visited Fund, has not transferred to the Home Fund all of the employer contributions made on the traveler's behalf.  Thus, the Reciprocity Agreement is consistent with the Court's conclusion that Plaintiff may enforce the Agreement under ERISA as part of the Local 38 Plan.

### 2)  Defendants Violated the Reciprocity Agreement

Having concluded that Plaintiff may enforce the Reciprocity Agreement under ERISA Section 502(a)(1)(B), the Court also concludes that Defendants violated the Agreement and thus abused their discretion.  The Reciprocal Agreement requires the Visited Fund (here, Defendants) to remit all contributions received by it on behalf of a traveler (here, Plaintiff), provided "the Home Fund certifies to the satisfaction of the Reciprocity Committee that the Traveler shall receive full credit for all Employer Contributions received by the Home Fund." (Dkt. No. 54-2 at 3 § 3.)  The United Association Reciprocity System's Administrator attests that "[b]ecause [Local 17 has a] "Full Credit Certification" on file with our office, Local 38 is required pursuant to Section 2 of the Reciprocity Agreement to transfer all contributions made on behalf of a Local 17 Traveler to the Local 17 Home Fund, without any deductions." (Dkt. No. 79 ¶ 5.)  As it is undisputed that Defendants have not transferred all of the contributions notwithstanding the "Full Credit Certification" for Local 17, Defendants have violated the Reciprocal Agreement as a matter of law.

Defendants argue that because the Reciprocity Committee just "rubber stamps" the certifications, the Agreement's requirement that the "Home Fund certifies to the satisfaction of the Reciprocity Committee that the Traveler shall receive full credit for all Employer Contributions

1    received by the Home Fund pursuant to this Agreement" has not been met.  (Dkt. No. 54-2 at 3 §

2    3.)  However, Defendants have not offered any evidence that supports an inference that the Local

3    17's certification was not to the satisfaction of the Reciprocity Committee.  Even if it is a "rubber

4    stamp," the certification has been made to the satisfaction of the Reciprocity Committee. [6]

5    Moreover, Defendants do not argue, let alone offer evidence, that Local 17 does not in fact give

6    full credit.  To the contrary, the undisputed evidence is that "[w]hen the U.A. Local 17 Pension

7    Plan receives contributions transferred by a Visited Fund, all contributions received are credited to

8    an individual bookkeeping account in the name of the Traveler, after the deduction [of $1.00/hour

9    for funding past and current benefits]."  (Dkt. No. 81 at ¶ 3.)

10          Defendants' argument that that the certification had to be made to the Visited Fund rather

11   than the Reciprocity Committee is bewildering.  According to the Declaration of Larry Mazzola

12   Sr., at the time the Reciprocal Agreement was created the U.A. Executive Committee, of which he

13   was a member, followed an informal rule known as the "Mazzola Clause" whereby if a Visited

14   Fund's pension rate was higher than the Home Fund's pension rate, then the Home Fund had to

15   certify to the Visited Fund that the member/traveler would receive full credit for the contributions

16   before the Visited Fund would transfer all contributions.  (Dkt. No. 86 ¶¶ 2-4.)  Defendants argue

17   that because it never received Local 17's certification, Local 38 only transferred the contributions

18   at the lower rate.  (Dkt. No. 60-1 at ¶ 5.)  However, the Reciprocity Agreement's plain language

19   provides that the certification must be to the satisfaction of the *Reciprocity Committee*; it nowhere

20   suggests that an additional certification must be made to the Visited Fund.  The so-called Mazzola

21   Clause thus directly contradicts the language of the Reciprocal Agreement.  (Dkt. No. 54-2 at 3;

22   Dkt. No. 79 ¶ 5.)  Local 38's attempt to rely on its own "informal" understanding is meritless.

23   *See, e.g.*, *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 956 (9th Cir. 2014) ("oral

24   agreements or modifications cannot be used to contradict or supersede the written terms of an

25   ───────────────

26   [6] The Court declines to strike Defendants' untimely request for judicial notice of the declarations
     submitted by Sean O'Ryan and Susan B. Rasheed in arbitration proceedings in another matter.

27   (Dkt. Nos. 98 & 99.)   Although Defendants' submission violates Local Rules 7-3(d) and 7-5, the
     declarations do not create an issue of material fact because even if the certifications are approved

28   pro forma this is immaterial to the question of whether they were to the satisfaction of the
     Reciprocity Committee—which they were.

United States District Court
Northern District of California

United States District Court
Northern District of California

ERISA plan. . . . The same rule applies to informal written interpretations of an ERISA plan.");

*Pierce Cty. Hotel Employees & Rest. Employees Health Trust v. Elks Lodge, B.P.O.E.* No. 1450, 827 F.2d 1324, 1328 (9th Cir. 1987) (stating that there is no defense of "oral modification of a collective bargaining agreement to a multiemployer trust fund's contribution claim under section 502 of ERISA, 29 U.S.C. § 1132."). The Reciprocal Agreement's unambiguous language requires full credit for the contributions made on a traveler's behalf if the requisite certification is made to the satisfaction of the Reciprocity Committee. Because such a certification was made here, Defendants abused their discretion by withholding from transfer to Plaintiff's Home Fund contributions made on his behalf.

### C. Plaintiff's ERISA Section 502(a)(2) Claim

Plaintiff also makes a claim under ERISA Section 502(a)(2) which permits a plan participant bring a civil action "for appropriate relief" under section 409. *See* 29 U.S.C. § 1132(a)(2). Section 409 provides that a plan fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from" a breach of his or her fiduciary duties. *Id.* § 1109. The statute also authorizes "such other equitable or remedial relief as the court may deem appropriate." *Id.*

#### 1) Plaintiff may Bring a Section 502(a)(2) Claim

Plaintiff argues that the trustees' failure to comply with the Reciprocity Agreement breached their fiduciary responsibilities under an instrument of the Plan. *See* 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries...in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.").

Defendants insist this claim fails because an ERISA Section 502(a)(2) claim can only be brought on behalf of a plan itself. As support they cite *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), which held that a plan participant could not bring suit for consequential damages suffered when a defined benefit plan delayed paying the plaintiff benefits owed. The Supreme Court emphasized that the text of § 409(a) characterizes the relevant

22

fiduciary relationship as one "with respect to a plan," and repeatedly identifies the "plan" as the victim of any fiduciary breach.  *See id.* at 140.  Because the *Russell* plaintiff received all the benefits owed from the defined benefit plan, and because that plan was not impaired by the trustees' delay, the plaintiff did not have a Section 502(a) claim.  In *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248 (2008), however, the Supreme Court recognized that a plaintiff may recover under Section 502(a) "for fiduciary breaches that impair the value of plan assets in a participant's individual account."  *Id.* at 256.

Plaintiff may bring a Section 502(a)(2) claim.  While the Local 38 Plan, like the plan at issue in *Russell*, is a defined benefits plan,[7] the Reciprocity Agreement requires the Visited Fund to create an individual account.  (Dkt. No. 54-2 at 3 § 2) ("such Visited Fund shall collect and receive the Employer Contributions due for the work of the Traveler and shall **keep separate accounts** of these contributions." (emphasis added)).  Plaintiff's allegation of fiduciary misconduct here—retaining employer contributions made on Plaintiff's behalf rather than transferring them to Plaintiff's Home Fund on Plaintiff's behalf—impairs Plaintiff's individual account and reduces the benefits that Plaintiff is eligible to receive;[8] thus, Plaintiff's claim falls within *LaRue*, 552 U.S. at 256, rather than *Russell*.

Defendants raise yet another argument against the Section 503(a)(2) claim: it fails because Plaintiff is seeking monetary damages.  Not so.  Plaintiff is seeking the available equitable remedy of a constructive trust.  *See Waller v. Blue Cross of California*, 32 F.3d 1337, 1339-40 (9th Cir. 1994); *Amalgamated Clothing & Textile Workers Union, AFL–CIO v. Murdock*, 861 F.2d 1406, 1419 (9th Cir. 1988); *see also Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1027 (9th Cir. 2009) (concluding that plan beneficiaries have standing under Section 502(a)(2) to pursue "[the]

---

[7] "A defined benefit plan, [] generally promises the participant a fixed level of retirement income, which is typically based on the employee's years of service and compensation"; in contrast, "a defined contribution plan or individual account plan promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions."  *LaRue*, 552 U.S. 248, 250 n.2 (2008).

[8] The record is undisputed that Plaintiff's Local 17 pension benefits are a percentage of contributions made on his behalf, including contributions transferred to Local 17 from a Visited Fund.  (Dkt. No. 81 ¶¶ 3-6.)

United States District Court
Northern District of California

equitable remedy [of] the establishment of a trust for benefits owing to the Plan participants.").

Plaintiff does not want damages; Plaintiff seeks to require Defendants to transfer to Plaintiff's

Home Fund the withheld contributions along with any earnings on that amount.

It bears noting that Defendants' position in this litigation that Plaintiff cannot bring any

ERISA claim directly contradicts their position in another action in this District involving pension

contributions made on a traveler's behalf.  *See Trustees of the U.A. Local 38 Defined Benefit*

*Pension Plan et al v. Trustees of the Plumbers and Pipe Fitters National Pension Fund et al.*, No.

13-5528 YGR (N.D. Cal.). There, Defendants stated with respect to the same Reciprocity

Agreement:

> The Reciprocity Agreement recognizes that the Traveler has standing to sue under ERISA. Section 11 provides that until "all" Employer Contributions have been transferred, the [] Traveler has a valid claim against the Visited Fund. [] Section 9 states that the [] Traveler has no claim under the Reciprocity Agreement. [] Because failure to transfer an "Employer Contribution" involves discretionary management of Home Fund assets, the [] **Traveler's claim against the Visited Fund trustees arises under ERISA**.

*Trustees of the U.A. Local 38*, No. 13-5528 YGR, Dkt. No. 43 at 2, n.2 (emphasis added).

Defendants continued: "The [] Traveler could then sue the Local 38 Trustees under ERISA §

502(a)(3), 29 U.S.C. § 1132(a)(3) for equitable restitution or surcharge of these missing Traveler

contributions."  (*Id.* at 3:1-5.)  While these statements are not subject to judicial estoppel, they are

nonetheless relevant to Defendants' fiduciary responsibilities.  It would violate ERISA's

fundamental purpose if Defendants could take contradictory views of their responsibilities and

liabilities under the Reciprocity Agreement whenever it suited their purpose.  Congress enacted

ERISA to ensure that "if a worker has been promised a defined pension benefit upon retirement—

and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually

receive it." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).

### 2)  Defendants Breached Their Fiduciary Duties

As the Court already determined that Defendants abused their discretion by withholding

contributions which the Plan required to be transferred to Plaintiff's Home Fund, it follows that

they violated their fiduciary duties in doing the same.  As no reasonable trier of fact could find

United States District Court
Northern District of California

otherwise, Plaintiff is entitled to summary judgment on his Section 502(a)(3) claim.[9]

### D. The Appropriate Remedy

ERISA section 502(a)(1)(B) allows a participant to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Under this provision Plaintiff is entitled to an order requiring Defendants to transfer the contributions improperly withheld to Plaintiff's Home Fund. Plaintiff seeks a similar remedy under his Section 503(a)(2) breach of fiduciary duty claim. On this claim, however, he also seeks the earnings Defendants made on the withheld contributions.[10] Defendants do not dispute that Plaintiff would not be entitled to earnings if he prevailed; since he has, he is entitled to the relief sought.

The question remains, however, as to how much of the withheld contributions were improperly withheld. Plaintiff argues that he is entitled to transfer of *all* contributions made on his behalf. Defendants insist that, at a minimum, the $7.75 contributed for every hour worked under Local 38's Pension Protection Act ("PPA") plan should not be transferred.

Local 38's PPA plan was enacted pursuant to the Pension Protection Act of 2006, 29 U.S.C. §§ 1085, which was created, in part, to address "the problems associated with underfunded pension plans," and "introduced a number of mechanisms aimed at stabilizing pension plans and ensuring they remain solvent." *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 130 (2d Cir. 2012). Under the Act, if a multi-employer pension plan becomes "endangered," the plan's trustees must propose options for a "funding improvement plan." 29 U.S.C. §§ 1085(b)(1), (c). The funding improvement plan is a "plan which consists of the actions, including options or a range of options to be proposed to the bargaining parties, formulated to provide, based on reasonably anticipated experience and reasonable actuarial assumptions, for the attainment by the plan during the funding improvement period." *Id.* § 1085(c)(3)(A). Among

---

[9] As the Court has ruled in Plaintiff's favor on his ERISA Section 502(a)(1)(B) and Section 502(a)(2) claims, the Court does not address his Section 502(a)(3) claim. *See Ford v. MCI Comms. Corp. Health & Welfare Plan*, 399 F.3d 1076, 1083 (9th Cir. 2005) (stating that relief under Section 502(a)(3) is not available where a plaintiff is otherwise able to obtain relief), rev'd on other grounds, *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202 (9th Cir. 2011).

[10] Plaintiff's briefing was unclear as to whether he also seeks earnings as a remedy to the Section 502(a)(1)(B) violation.

United States District Court
Northern District of California

1   other options, the plan's bargaining parties can opt to increase employer contributions or decrease

2   future benefits to comply with a funding improvement plan. *Id.* § 1085(c)(1).

3          In the other action in this District involving pension contributions made to Local 38 on a

4   traveler's behalf, the court noted that Local 38 was an "endangered" plan that had elected to

5   increase employer contributions rather than decrease future benefits under its funding

6   improvement plan. *See Trustees of the U.A. Local 38 Defined Benefit Pension Plan v. Trustees of*

7   *the Plumbers & Pipe Fitters Nat'l Pension Fund*, No. 15-CV-04703-YGR, 2016 WL 245281, at

8   *8 (N.D. Cal. Jan. 21, 2016), aff'd, No. 16-15228, 2016 WL 7422715 (9th Cir. Dec. 23, 2016).

9   Under Local 38's PPA (also known as its funding improvement plan) "employers of traveling

10   employees working in Local 38's territory pa[y] increased contributions, i.e. the PPA

11   contributions, to Local 38." *Id.*

12          Defendants raise the same arguments here as they did in the prior action; namely, that PPA

13   contributions can only to be used to pay for previously promised benefits to Local 38 participants

14   and cannot be used to fund current or future benefits for travelers.  Plaintiff counters that the

15   Reciprocal Agreement language is unambiguous—it requires transfer of all contributions such that

16   the participating fund merely acts as a "conduit to the money transferred to the correct fund."

17   (Dkt. No. 77 at 22-9-10 (quoting  *Lehman v. Nelson*, No. C13-1835 RSM, 2014 WL 4540160, at

18   *9 (W.D. Wash. Sept. 11, 2014)).)  However, as Defendants emphasize, the Reciprocity

19   Agreement predates the PPA and thus does not expressly address PPA contributions.  Further, the

20   Reciprocity Agreement defines "Employer Contributions" as "full payment of 100% of the

21   contributions which an employer makes to a signatory pension fund for the purpose of providing a

22   plan of pension benefits for employees."  (Dkt. No. 54-2 at 3.)  There is a question as to whether

23   the PPA payments fall within this definition.

24          The Ninth Circuit recently rejected Local 38's argument that an arbitrator had erred in

25   "determining that PPA contributions were part of 'Employer Contributions' that must be remitted

26   under the terms of the United Association Pension Fund Reciprocal Agreement." *Trustees of the*

27   *U.A. Local 38 Defined Benefit Pension Plan v. Trustees of the Plumbers & Pipe Fitters Nat'l*

28   *Pension Fund*, No. 16-15228, 2016 WL 7422715, at *1 (9th Cir. Dec. 23, 2016).  The court noted

that "[t]here is no well defined, explicit, and clearly applicable law that bars PPA contributions

United States District Court
Northern District of California

United States District Court
Northern District of California

from being reciprocated." *Id*. (internal citation and quotation marks omitted).  The question there, however, was whether the arbitrator's decision had to be vacated, not whether the arbitrator had the discretion to exclude the PPA contributions from transfer to the home fund.

As the parties have noted, this very question is presently on appeal before the Ninth Circuit.  *See Richard Lehman v. Warner Nelson, et al*, Docket No. 15-35457 (9th Cir. filed Jun 10, 2015). This issue shall be addressed at the further case management conference.

### E.  Plaintiff's ERISA Section 502(c)(1) Claim

ERISA's civil enforcement mechanism at Section 502(c) imposes personal liability on a plan administrator  "who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant."  29 U.S.C. § 1132(c)(1). Upon such a violation, the court may, in its discretion, award penalties in the amount of up to $100 a day from the date of such failure or refusal.  *Id*. at § 1332(c)(3).  In his fourth claim for relief Plaintiff seeks $58,630 in penalties under this section for Machi's willful disregard of his responsibilities as Plan Administrator.  The Court, in its discretion, declines to award penalties. Penalties are not appropriate merely because the Plan's legal position is ultimately unavailing. Machi's conduct was not in bad faith and while there was some delay in providing Plaintiff with the relevant Plan documents it was not so egregious as to amount to willful disregard of Machi's responsibilities as Plan Administrator.  *See Moon v. Rush*, 69 F.Supp.3d 1035, 1046 (E.D. Cal. 2014) (in awarding penalties under Section 1332(c) courts are to consider any bad faith or intentional misconduct by the administrator, the length of delay, the number of requests made and the extent and importance of the documents withheld, and any prejudice to the participant) (citing *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir. 2002)).

### CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Plaintiff's motion for summary judgment and GRANTS in part and DENIES in part Defendants' motion for summary judgment.  The Court grants Plaintiff's motion for summary judgment on his ERISA Sections 502(1)(B) and 503(a)(2) claims as set forth above.  The Court will hold a further case management conference on March 9, 2017 to address next steps, keeping in mind that Plaintiff

brought this case as a putative class action.  The parties shall submit a further joint case management conference statement, ideally with a proposed schedule that brings the case to resolution, one week before the conference.  The Court directs Plaintiff to make his motion as to attorney's fees and costs at the conclusion of the action.

This Order disposes of Docket Nos. 77, 89, 93 and 99.

**IT IS SO ORDERED.**

Dated: February 7, 2017

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California